RENDERED: APRIL 4, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1157-ME

C.L.P. APPELLANT

v.
APPEAL FROM FAYETTE FAMILY COURT
HONORABLE ROSS EWING, JUDGE
ACTION NO. 23-AD-00184

CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
D.L.G.C., A CHILD; AND
T.R.H. APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; KAREM AND TAYLOR, JUDGES.

KAREM, JUDGE: C.L.P. appeals from the Fayette Family Court's findings of

fact, conclusions of law, and order terminating his parental rights of his minor son.

Upon careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

C.L.P. ("Father") is the biological father of L.G.C. ("Child"), who was born on October 3, 2021. At that time, Father was living with Child's mother, T.R.H. ("Mother"), in Jessamine County. Father has two other minor children, but he has no contact with them and has not seen them for several years.

In November 2021, the Cabinet for Health and Family Services filed a dependency, neglect, and abuse ("DNA") petition against Mother and Father, based on allegations of domestic violence and substance abuse made by Mother's younger sister, who was living with the couple. The Cabinet's investigative worker who visited their home described it as full of trash and clutter with multiple holes in the wall that appeared to have been caused by someone punching the walls. The Jessamine Family Court placed Child in the emergency custody of the Cabinet. Both parents stipulated to neglect, and Child was returned to Mother on December 21, 2021.

On March 11, 2022, the Cabinet filed a second DNA petition after Mother was discharged from a Salvation Army facility and declined assistance in locating alternative housing. The Cabinet again assumed emergency custody of Child. He was committed to the Cabinet on May 12, 2022, and has remained in foster care ever since. The case was transferred to Fayette Family Court in June 2022 when Mother moved to Fayette County. Mother and Father are no longer

living together, and Father started a new relationship with a woman to whom he is engaged.

The Cabinet prepared a case plan for Father and provided various services, including supervised visitation, assessments for parental capacity, drug testing, and programs for batterers' intervention, anger management, and mental health. Father was required to provide documentation that he had the ability to meet the basic needs of the family: to maintain clean, appropriate, and stable housing. Additionally, Father was ordered to complete various assessments and follow the resulting recommendations including: a parenting assessment or parenting classes; an anger management assessment; a domestic violence perpetrator assessment; and a mental health assessment. Lastly, Father was ordered to submit to random drug screenings.

The main areas of concern regarding Father's role as a parent were his chronic mental health problems, history of and propensity to perpetrate domestic violence, unwillingness to admit fault or to change, unwillingness to follow the orders of the court, and a proclivity to abuse substances. Although Father completed most of the requirements of his case plan, including the completion of a batterers' intervention program ("BIP") in December 2022, he failed to comply with court-ordered drug screenings and was the subject of a new domestic violence order ("DVO") entered in February 2023.

On October 16, 2023, the Cabinet filed a petition for involuntary termination of parental rights against Mother and Father. Mother executed a waiver and consent to termination of her parental rights, and she is not a party to this appeal.

The family court held an evidentiary hearing which began on April 30, 2024, and was continued on August 6, 2024. Psychologist Dr. Elizabeth Cravero testified on behalf of Feinberg & Associates, which conducted the parenting capacity assessment of Father. The team produced a lengthy and detailed report which found that Father had a difficult and traumatic childhood. He suffers from chronic mental health issues, including mood disorder, oppositional defiant disorder, bipolar disorder, PTSD, and depression. Father was highly defensive during the assessment and admitted lying to the evaluators. He continued to minimize the role he played in the problems in his home and in his relationships with others. Father admitted that he intended to flee the state to avoid further Cabinet intervention relating to children he may have in the future. The report characterized the admission as "indicative of his unwillingness to admit fault, make changes, or prioritize the needs of his children." The report also stated that Father had threatened a Cabinet worker and a clinician. The report opined that, in light of his behavior while being monitored by the Cabinet, any child in his care would be at high risk once the Cabinet's case was closed. Dr. Cravero

testified that there was a poor prognosis for significant change on Father's part and she recommended against reunification.

Father placed items into evidence to illustrate that he had complied with his case plan including: a letter that he was receiving $943 per month in Supplemental Security Income for his disability; a lease from his rental home in Nicholasville; a certificate of his completion of the Intensive Outpatient Programming at JourneyPure, Lexington, on March 11, 2024; a certificate that he had completed 24:7 Dad AM in Lexington on March 31, 2022; a letter indicating he had completed his recommended 28 BIP sessions with Changed Lives on May 14, 2022; and a medical marijuana prescription.[1] Father regularly attended visitation with Child, with whom he has a good relationship. He brought Child clean clothing, which he took back if it was not needed, a sippy cup with milk, and occasional gifts. Father testified that in addition to his disability income, he works odd jobs for a total monthly income between $3,000 and $6,000.

Father was ordered by the court on March 27, 2023, to undergo regular drug screening three times per week. For his convenience, he was permitted to have the screening performed at the Jessamine County Detention Center in Nicholasville, near his home. He failed, however, to screen regularly.

---

[1] Prescription issued by a physician in Louisville, pursuant to Governor Beshear's executive order, effective January 1, 2023.

According to a Cabinet review filed on September 1, 2023, Father's last drug screen was August 26, 2023, and was positive for marijuana metabolite. He had only tested six times since July 27, 2023, and all tests were positive for marijuana metabolites.

Father acknowledged that he was not complying with the court order to drug screen and claimed it was due to a lack of reliable transportation. He also testified that he did not like going to the detention center because the personnel there did not treat him with respect. Father testified that he is legally entitled to possess eight ounces of marijuana pursuant to a medical marijuana certificate. He explained that he uses marijuana regularly as it is the only medication which alleviates the symptoms of his PTSD. Father testified that he makes a five-hour trip to Michigan five times per month to purchase marijuana.

According to a review prepared for the family court by CASA, Father has a long history with the Cabinet, including four substantiated risk of harm findings; four substantiated supervision findings; and one substantiated physical abuse finding in the prior four years. His criminal history includes convictions for criminal abuse in 2018, violation of an EPO/DVO in 2021, and fleeing/evading police in 2017.

Evidence was introduced at the hearing that the family court had entered an EPO against Father on January 1, 2023, and a subsequent DVO on

February 13, 2023, based on allegations that he was stalking and threatening Mother. The family court expressed particular concern about this proceeding because it had conducted a full evidentiary hearing and made specific findings that domestic violence had occurred. Some of these more recent incidents of violence had occurred just as Father was completing BIP in December 2022.

Furthermore, shortly before the termination hearing, Father's fiancée filed a petition for an interpersonal protective order ("IPO") against him, alleging that he started abusing her a year ago, threatened her, and damaged their apartment. Father informed the court that he had just received evidence on the evening before the hearing in the form of video and texts on his phone, showing that his fiancée had recanted her accusations. He did not present the evidence but was permitted to testify about it. Following the hearing, the family court entered findings from the bench and then written findings of fact and conclusions of law, together with an order terminating Father's parental rights.

This appeal by Father followed. Further facts will be set forth below as necessary.

## STANDARD OF REVIEW

"An appellate court will only reverse a trial court's decision to terminate a parent's rights if such decision is clearly erroneous, meaning there is no substantial, clear, and convincing evidence to support the decision." *P.S. v.*

*Cabinet for Health and Family Services*, 596 S.W.3d 110, 115 (Ky. App. 2020); Kentucky Rules of Civil Procedure ("CR") 52.01. "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 117 (Ky. App. 1998) (quoting *Rowland v. Holt*, 253 Ky. 718, 70 S.W.2d 5, 9 (1934)). "The termination of parental rights is a particularly fact-sensitive inquiry, so appellate courts are disinclined to disturb a trial court's findings." *Cabinet for Health and Family Services v. H.L.O.*, 621 S.W.3d 452, 462 (Ky. 2021). Thus, if the trial court's findings are not clearly erroneous and they substantially support termination, we will affirm the order. *Id.*

## STATUTORY FRAMEWORK

A family court may involuntarily terminate an individual's parental rights if the court finds by clear and convincing evidence the existence of three critical elements. *Id.* (citing Kentucky Revised Statutes ("KRS") 625.090). First, the trial court must find that the child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction or by the family court itself in the termination proceeding. KRS 625.090(1)(a)1. and 2. Second, the court must find the presence of at least one of the eleven grounds listed in section (2) of the statute. KRS 625.090(2)(a)-(k). Third,

-8-

termination of parental rights must be in the child's best interest, and the court is provided with a series of factors that it shall consider when making this determination. KRS 625.090(1)(c); KRS 625.090(3).

## ANALYSIS

Father acknowledges that the first prong of the test set forth above was met, as the Cabinet presented evidence that Child was adjudicated a neglected child, KRS 625.090(1)(a)1. He further acknowledges that the evidence supports the finding under the second prong that Child "has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights[.]" KRS 625.090(2)(j).

Father disputes the sufficiency of the evidence under the factors listed in KRS 625.090(2)(e) and (g). These factors require a finding that Father:

> for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;
>
> [and]
>
> for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable

-9-

> expectation of significant improvement in the parent's
> conduct in the immediately foreseeable future,
> considering the age of the child[.]

Father points to evidence that he has found stable housing and has the income and ability to care for Child. The family court acknowledged Father's testimony that he receives income from disability payments and odd jobs, yet also found that Father has never provided any form of support for Child, who has been in foster care for virtually his entire life. The family court observed that Father had put considerable efforts into researching the availability and legality of medical marijuana but had never tried to ascertain whether Child is entitled to any federal disability benefits. The family court also found that while Father wanted Child to live with him, he had made no tangible, realistic plans for childcare and full-time parenting. The family court's findings under KRS 625.090(e) and (g) are supported by substantial evidence in the record and therefore not clearly erroneous.

Father's main focus is the family court's analysis of Child's best interest under KRS 625.090(3). Father completed the classes recommended by the Cabinet, attended supervised visitation with Child and brought him various items. He admits he did not consistently undergo drug screenings but points out there was no evidence that he is currently addicted to any substance besides marijuana, which he testified he is using legally with permission from an executive order. He contends the Cabinet could have used hair follicle testing to relieve him of the

burden of "extremely frequent" drug testing. He contrasts his situation with that of the appellant father in *D.H. v. Cabinet for Health and Family Services*, 640 S.W.3d 736 (Ky. App. 2022). In that case, the termination of parental rights was affirmed in part because the father did not attempt to work on his case plan for over two years and then participated only sporadically. *Id.* at 741.

Under KRS 625.090(3)(a), the court recognized that Father was the product of a childhood filled with trauma and has suffered from psychological problems for many years. Under KRS 625.090(3)(c), the court found that the Cabinet had made reasonable efforts to reunite Father with Child, including providing drug testing in Father's home county. Under KRS 625.090(3)(d), the court recognized that Father had made efforts and indeed had completed most of the requirements of his case plan. The court observed that it could think of no other programs in which Father could participate which could be helpful and expressed concern that Father had merely "jumped through the hoops" but had not gained insight from the classes he had completed, as evidenced by his testimony that "it takes two to be in a fight." The court found that Father's refusal to drug screen in compliance with a court order showed a lack of effort, especially because he lived within walking distance of the detention center where the testing was conducted. Perhaps of the greatest concern to the court was the fact that domestic

-11-

violence occurred either during or shortly after Father completed BIP, as evidenced by the court's findings in the DVO case involving Mother.

The family court's conclusion that the termination of parental rights was in Child's best interest was based on clear and convincing evidence that the possibility of improvement on Father's part, two years after Child was placed in the Cabinet's custody, was unlikely. Although Father had completed most of his case plan, unlike the father in *D.H.*, he failed to demonstrate he had benefited from the programs in which he participated; he continued to commit domestic violence; and he continued to refuse to comply with the court's order to drug screen.

Next, Father claims that on the evening before the second part of the termination hearing, he received texts and video from his fiancée proving she had fabricated her accusations against him in the IPO proceedings. He argues the family court violated his due process rights in not allowing him to present this evidence under one of the hearsay exceptions found in Kentucky Rules of Evidence ("KRE") 803. This argument is not preserved. Father's attorney described the evidence as hearsay, and she did not seek to have it admitted under a hearsay exception. She raised the issue at the hearing when she asked Father, "Without going into too much detail, because you can't use hearsay in this courtroom, did you recently receive information from the petitioner in the most recent IPO?" The Cabinet objected on hearsay grounds. A bench conference was

conducted in which the court explained that it was more concerned with the DVO case it had recently adjudicated after Father had completed BIP. The court plainly stated that the resolution of the case did not hinge on the IPO. It ruled that the actual evidence would not be admitted but Father could testify as to why he thought the IPO allegations were false and to tell his side of the story, which is what his attorney had requested. Thus, in addition to the fact that any error connected with the exclusion of the evidence was unpreserved, by the family court's clear statement the IPO proceedings did not play a significant part in its decision to terminate Father's parental rights.

## CONCLUSION

Our review indicates that the family court's findings under the statutory factors of KRS 625.090 are based on substantial, clear and convincing evidence in the record. Accordingly, we affirm the family court's findings of fact, conclusions of law, and order terminating Father's parental rights.

ALL CONCUR.


BRIEFS FOR APPELLANT:

John Gerhart Landon
Lexington, Kentucky

BRIEFS FOR APPELLEE CABINET
FOR HEALTH AND FAMILY
SERVICES:

Dilissa G. Milburn
Mayfield, Kentucky